OPINION
 

 By the Court,
 

 Rose, C. J.:
 

 Appellant Avetis Archanian beat to death Elisa Del Prado and her mother Juana Quiroga in the back room of the jewelry store owned by Del Prado and her family and then absconded with thousands of dollars’ worth of jewelry. The jury found Archanian guilty of two counts of first-degree murder with the use of a deadly weapon of a victim 65 years of age or older and returned a sentence of death. The jury also found Archanian guilty of two counts of robbery with the use of a deadly weapon of a victim 65 years of age or older, for which he was sentenced to four consecutive terms of 72 to 180 months in prison.
 

 Archanian alleges a number of errors occurred at trial, none of which, we conclude, warrant relief. However, as part of our mandatory review, we conclude that one of the two aggravating circumstances found to support Archanian’s death sentence must be stricken pursuant to our decision in
 
 McConnell v.
 
 State
 
 [1]
 
 After
 
 *1025
 
 reweighing the remaining aggravating and mitigating evidence, we conclude beyond a reasonable doubt that the jury would have imposed death absent the erroneous aggravating circumstance. Accordingly, we affirm the judgment of conviction and sentence of death.
 

 FACTS
 

 Guilt phase
 

 Like any other morning, on September 2, 2003, around 9:20, Archanian entered the World Merchants jewelry store in Las Vegas, where he was employed as a jewelry repairman. Shortly after his arrival, however, the usual routine turned shockingly violent. A surveillance recording showed Archanian greeting 67-year-old Elisa Del Prado, the store owner, and then retreating to the store workroom. Minutes later, Del Prado entered the workroom, apparently at Archanian’s behest. Soon thereafter, 86-year-old Juana Quiroga, Del Prado’s mother, apparently heard a commotion in the workroom and went to investigate. Moments later, Quiroga attempted to escape but was dragged back into the room. Her legs kicked about, and then all movement ceased. Archanian exited the room, retrieved numerous pieces of jewelry from various trays and cases, and left the store.
 

 Around 10:00 that morning, Esther McElhaney arrived at the World Merchants jewelry store to have a bracelet repaired. As she reached to push the buzzer to be let into the store, Archanian stopped her and told her “not to touch anything.” He led McElhaney to a store window and told her to look inside. McElhaney saw Quiroga’s body lying on the floor and Del Prado’s legs. Archanian told McElhaney that he had called 9-1-1 but that no one had yet arrived. Archanian dialed 9-1-1 again, but handed the phone to McElhaney because he did not speak English clearly.
 
 [2]
 

 When a police officer arrived at the scene, she discovered Quiroga dead, with a bloody hammer resting near her body. She also found Del Prado seriously wounded but still alive. When paramedics lifted Del Prado onto a gurney, a 12- to 14-inch metal rod fell out of the back of her skull. The metal rod was later determined to be a ring sizer. Del Prado survived for about six months after the attack, during which time she opened her eyes but was never able to communicate. She succumbed to her injuries on March 7, 2004.
 

 After reviewing the surveillance recording, a police officer recognized Archanian as an individual he interviewed when he first arrived at the scene. Archanian was located and arrested hours after the murders.
 

 
 *1026
 
 Crime scene analysts collected, examined, and tested several pieces of physical evidence. The hammer found next to Quiroga’s body was covered in her blood. The metal ring sizer that fell out of Del Prado’s skull tested positive for her blood. Quiroga’s blood was also found on Archanian’s pants, and Del Prado’s blood was found on a pair of his gloves and on his pants and shirt.
 
 [3]
 
 Del Prado’s blood was also found on a fire extinguisher recovered from the store. Human female blood was found on Archanian’s satchel and shoes, but the source of the blood could not be determined. Human blood was also found on Archanian’s car door, but the sample was too small to identify whose blood it was. Jewelry from the store was discovered in Archanian’s pockets and in his car.
 

 Quiroga’s autopsy revealed that she suffered multiple head lacerations and skull fractures caused by a blunt instrument. A sub-arachnoid hemorrhage was discovered on the surface of her brain, and she sustained large bruises on both shoulders. The forensic pathologist concluded that Quiroga died from blunt force trauma and that the manner of death was homicide.
 

 Del Prado’s autopsy disclosed that she sustained multiple wounds to her skull, including an area where a portion of her skull was missing. She also suffered injuries to her brain, including a section where her brain was missing. The forensic pathologist concluded that Del Prado died from blunt force trauma due to assault and that the manner of death was homicide.
 

 Archanian asserted no defense at trial other than he did not commit the crimes. Further, he called four witnesses, all of whom described him as a nonviolent, helpful, and patient person. His sister testified that he fainted at the sight of blood.
 

 The jury found Archanian guilty on all counts.
 

 Penalty hearing
 

 During the penalty hearing, the State called several of Quiroga and Del Prado’s relatives. The witnesses testified that they missed the women very much and that their murders had devastated the family. Quiroga was described as very loving, independent, and religious. Her daughter testified that Quiroga was born in Cuba and was very proud when she became a United States citizen. Witnesses described Del Prado as hard-working, sophisticated, elegant, loved by many, and having provided her children with a fairytale childhood. Del Prado volunteered in the community, won several community awards, and took care of her grandchildren while her single daughter worked long hours. Javier Del Prado,
 
 *1027
 
 Del Prado’s son, testified that she tried to help Archanian by giving him a job and that his actions were treasonous.
 

 Archanian called four witnesses in mitigation. He grew up in Armenia, and his family moved to the United States in 1977 when he was 20 years old. His sister testified that as a young boy in Armenia he helped his neighbors by shopping for them or performing various household chores. Archanian was described as a peaceful, nonviolent man and the murders were described as being out of his character. Several witnesses testified that his execution would devastate his family and that they would miss him. Archan-ian’s wife and 19-year-old son, Avak, testified that Archanian fainted at the sight of blood. Avak also described Archanian as a good father with whom he had a close relationship. Archanian made a statement in allocution via a letter read to the jury. He described Del Prado and Quiroga as “pleasant and smiling” people and expressed his “deepest sorrow” to the family. Archanian ftir-ther expressed his disbelief that Del Prado and Quiroga were dead.
 

 The State alleged three aggravating circumstances for each murder: that the murder was committed during the commission of or an attempt to commit or flight after committing or attempting to commit a robbery;
 
 [4]
 
 that the murder was committed to “receive money or any other thing of monetary value’ ’ ;
 
 [5]
 
 and that the murder was committed by a person who had, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree.
 
 [6]
 
 Prior to the penalty hearing, the State withdrew the receiving-money aggravating circumstance because the jury had found Archanian guilty of robbery. The jury found the two remaining aggravating circumstances in each of the murders.
 

 Numerous mitigating circumstances were submitted for the jury’s consideration for both murders, including: that Archanian had no significant history of prior criminal activity; that he had lifetime full employment; that as a boy he delivered food and medicine to his neighbors without pay; that he had to leave home at age 20 to flee communist oppression; that his father died when he was 22 years old and that he held the family together; that when his mother-in-law committed suicide he held the family together; that he helped five families fleeing communism get established in the United States; and any other mitigating circumstance. Only one mitigating circumstance was found for each murder — that Archan-ian had no significant history of prior criminal activity.
 

 The jury further unanimously found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating cir
 
 *1028
 
 cumstance and imposed death for each murder. Archanian was also sentenced to four consecutive terms of 72 to 180 months in prison for the two robbery counts.
 

 DISCUSSION
 

 Admission of videotape
 

 Archanian alleges that the district court erred in admitting a videotape, arguing that it violated the best evidence rule and was not properly authenticated. World Merchants jewelry store was equipped with a digital surveillance system. Las Vegas Metropolitan Police Department (LVMPD) Detective Jeff Rosgen testified that ADT Security maintained the digital surveillance system and that an ADT technician reported to the crime scene and played what was recorded on the system during the time the crimes were committed. The surveillance system recorded images digitally and stored them on a hard drive. The technician connected the surveillance system to a VCR and a monitor, allowing Detective Ros-gen to review the images and simultaneously creating a videotape of the recorded events, herein referred to as the first videotape. Four surveillance cameras continuously captured images from the store, which appeared on the monitor in a four-plex format,
 
 i.e.,
 
 the monitor was divided into four sections, with images from each camera simultaneously displayed. Detective Rosgen testified that he gave the first videotape to the police video unit, where a technician produced a composite videotape, reducing the four-plex view to a one-plex view. The technician also added circles and arrows to this composite videotape to highlight particular areas. It was this composite videotape that was shown to the jury. Detective Rosgen further stated that the composite was an accurate representation of the images he observed when the ADT representative played the digital surveillance recording for him.
 

 The State sought admission of the composite videotape, and defense counsel objected for lack of foundation. Counsel conducted a voir dire of Detective Rosgen, who acknowledged that he had no way of knowing whether the images were accurately transferred from the surveillance equipment to the VCR, but that the substance of the composite videotape was identical to the images he originally viewed on the monitor downloaded from the digital surveillance system. The district court admitted the composite videotape, and the State’s direct examination resumed.
 

 During cross-examination, Detective Rosgen acknowledged that he did not compare the surveillance hard drive images with the first videotape “bit for bit,” but that the images on the first videotape were the same as the images he viewed from the digital surveillance equipment at the scene. Detective Rosgen also testified that the hard drive unit was impounded and in possession of the police.
 

 
 *1029
 
 After the presentation of all the evidence, the district court allowed counsel to further explain his objection to the admission of the composite videotape. Counsel argued that admission of the composite videotape violated the best evidence rule due to the modifications made by the police technician. He acknowledged that he was not asserting that the composite videotape shown to the jury was in any way inaccurate, but that modifying the view from a four-plex format to a one-plex format placed undue emphasis on particular images. And therefore the composite videotape was not a true and correct copy of the first videotape. Counsel further complained that Detective Rosgen never compared the first videotape with the digital surveillance system’s hard drive. Therefore, he argued, the composite videotape should have been excluded.
 

 Archanian argues on appeal that the surveillance system hard drive was the original recording and that the district court improperly allowed the State to prove the contents of the hard drive with the composite videotape. He argues that the composite videotape violated NRS 52.235, also known as the best evidence rule, which provides that “[t]o prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in this title.” And NRS 52.245(1) allows the admission of a duplicate of the original unless “[a] genuine question is raised as to the authenticity of the original” or “[i]n the circumstances it would be unfair to admit the duplicate in lieu of the original.’ ’
 

 To the extent Archanian argues that the composite videotape was inadmissible due to alterations and modifications, we conclude that he fails to show any unfairness in admitting the composite videotape in lieu of the original recording. There is no evidence suggesting that the composite videotape was inaccurate, that any relevant or exculpatory information had been deleted from it, or that the modifications made to it adversely affected or obscured the content. In fact, as noted above, counsel acknowledged at trial he was not arguing that the composite videotape was inaccurate. District courts are vested with considerable discretion in determining the relevance and admissibility of evidence.
 
 [7]
 
 “Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.’ ’
 
 [8]
 
 A district court’s decision to admit or exclude evidence will not be reversed on appeal unless it is manifestly wrong.
 
 [9]
 
 We conclude that Archanian fails to demonstrate that the district court abused its discretion in this instance.
 

 
 *1030
 
 Additionally, Archanian contends that the district court violated NRS 52.015 because the composite videotape was not properly authenticated. Pursuant to NRS 52.015(1), “[t]he requirement of authentication ... is satisfied by evidence or other showing sufficient to support a finding that the matter in question is what its proponent claims.” Here, Detective Rosgen testified that the substance of the composite videotape was identical to what he viewed downloaded from the surveillance system on the first videotape. He also testified that the content of the composite videotape was consistent with what he observed at the crime scene. Moreover, Detective Rosgen stated that he reviewed the first videotape and the composite videotape numerous times and was very familiar with their content. Although not familiar with the inner workings of the digital surveillance system, Detective Rosgen described how the images on the first videotape were downloaded and recorded directly from the surveillance system and how the composite videotape was created and modified from the first videotape.
 

 Archanian argues that the State should have called an ADT technician to testify to the authenticity of the first videotape. This would have been the better course to establish the foundational link between the digital surveillance recording and the first videotape. However, we conclude that Archanian has not established any prejudice. The surveillance system hard drive was in police custody, and the defense had access to it and could have investigated any concerns regarding the original digital recording or how it was downloaded to the first videotape, including interviewing an ADT technician. Nothing in the record raises such concerns. Detective Rosgen observed the technician play the surveillance recording and download it to the first videotape. He testified to this and to the creation of the composite videotape, and defense counsel conceded that the composite videotape played at trial was accurate. Detective Rosgen’s testimony sufficiently authenticated the composite videotape, and Archanian has revealed nothing that throws into question the authenticity of the original surveillance recording or the first videotape. Therefore, we conclude that the district court did not abuse its discretion in admitting the composite videotape.
 

 Admission of autopsy photographs
 

 Archanian argues that the district court erred in admitting three autopsy photographs, exhibits 69, 71, and 72. He contends that the forensic pathologist’s testimony was gruesome enough to shock and inflame the jury and adequate to explain the nature and quality of the victims’ injuries, thereby eliminating any need to present the
 
 *1031
 
 challenged photographs to the jury. Archanian failed to object to exhibits 71 and 72. Thus, he failed to preserve this matter for appeal and must demonstrate plain error.
 
 [10]
 
 In conducting a plain-error analysis, we must consider whether error exists, if the error was plain or clear, and if the error affected the defendant’s substantial rights.
 
 [11]
 
 The burden rests with Archanian to show actual prejudice.
 
 [12]
 
 Exhibits 71 and 72 are autopsy photographs of Del Prado, which the forensic pathologist used to describe her wounds and explain the cause of death. We conclude that Archanian failed to show that the district court committed plain error in admitting them.
 

 We now turn to Archanian’s challenge to exhibit 69, which he preserved for appellate review. “The admissibility of gruesome photographs showing wounds on the victim’s body Ties within the sound discretion of the district court and, absent an abuse of that discretion, the decision will not be overturned.’ ”
 
 [13]
 
 This court has repeatedly upheld the admission of autopsy photographs, even grisly ones, when they are used to demonstrate the cause of death and reflect the severity of wounds and the manner in which they were inflicted.
 
 [14]
 
 Exhibit 69 depicts the wounds to Quiroga’s head. The forensic pathologist used it to explain to the jury the nature of her wounds and the basis for concluding that her injuries resulted from blunt force trauma. The challenged photograph was relevant to explaining the cause and manner of Quiroga’s death and was not unduly gruesome. Therefore, we conclude that the district court did not abuse its discretion in admitting exhibit 69.
 

 Sufficiency of the evidence to support deadly weapon enhancement
 

 Archanian makes two challenges to the sufficiency of the evidence to support the deadly weapon enhancement for each murder. First, he argues that the forensic pathologist was unable to identify the instruments used to inflict Quiroga’s and Del Prado’s injuries and was never shown pictures of any suspected weapons. Therefore, Archanian argues, the State failed to prove beyond a reasonable doubt that a deadly weapon was used. We disagree.
 

 
 *1032
 
 NRS 193.165(5)(b) defines a deadly weapon as “[a]ny weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death.” The hammer lying next to Quiroga’s body, covered in her blood, coupled with evidence that she died from blunt force trauma to her head sufficiently supports a finding that the hammer was readily capable of causing death and that it was used to murder Quiroga. We conclude that the hammer constituted a deadly weapon under the circumstances of this case.
 

 Similarly, evidence that the ring sizer fell out of Del Prado’s skull when she was treated at the scene and that she died of blunt force trauma indicates that it was used to impale and/or bludgeon Del Prado’s slcull and brain, causing her death. We conclude that this evidence sufficiently supports a conclusion that the ring sizer was readily capable of causing death. Therefore, Archanian’s contention that the evidence fails to show that a deadly weapon was used to murder Del Prado lacks merit.
 

 Archanian’s second claim is that the State presented no evidence connecting him to a deadly weapon, noting that crime scene analysts were not provided with a sample of his DNA. The videotape evidence indisputably connects Archanian to the crimes. Other evidence, including jewelry from the store recovered from his person and car and the presence of the victims’ blood on his clothing, also linked Archanian to the killings. This evidence sufficiently tied him to the crimes, and as we explained above, the evidence sufficiently established that the murders were committed with the use of a deadly weapon. Therefore, Archanian’s claim that no evidence exists connecting him to a deadly weapon lacks merit.
 

 Failure to record portions of the trial proceedings
 

 Archanian argues that several chambers and sidebar conferences were not recorded and transcribed, thereby denying him meaningful appellate review in violation of his due process rights. “Only rarely should a proceeding in a capital case go unrecorded.”
 
 [15]
 
 SCR 250(5)(a) requires the district court to
 

 ensure that all proceedings in a capital case are reported and transcribed, but with the consent of each party’s counsel the court may conduct proceedings outside the presence of the
 
 *1033
 
 jury or the court reporter. If any objection is made or any issue is resolved in an unreported proceeding, the court shall ensure that the objection and resolution are made part of the record at the next reported proceeding.
 

 Meaningful and effective appellate review is dependent upon the availability of an accurate record, and the “ ‘[fjailure to provide an adequate record on appeal handicaps appellate review and triggers possible due process clause violations.’ ”
 
 [16]
 

 This court has recognized, however, that a capital defendant’s right to have trial proceedings recorded and transcribed is not absolute and that “SCR 250 and due process do not require the presence of the court reporter at every sidebar conference, but the court must make a record of the contents of such conferences at the next break in the trial and allow the attorneys to comment for the record.”
 
 [17]
 
 Further, “[t]he mere failure to make a record of a portion of the proceedings ... is not grounds for reversal.”
 
 [18]
 
 Rather, Archanian must show that the subject matter of the omitted portions of the record was so significant that this court cannot meaningfully review his claims of error and the prejudicial effect of any error.
 
 [19]
 

 Archanian points to several instances in the record in which the district court referenced hearings that occurred in chambers and were unrecorded. The first concerns State exhibit 19, which the district court apparently determined was admissible in an unrecorded chambers conference. However, at the conclusion of the presentation of evidence, the district court afforded defense counsel the opportunity to voice his objections to various photographs, including State exhibit 19, in a hearing outside the presence of the jury. We conclude that Archanian fails to demonstrate any prejudice resulting from the unrecorded chambers conference relating to State exhibit 19 for two reasons. First, counsel was allowed to make a record of his objection, and therefore he was not denied the opportunity for meaningful review. Second, Archanian does not raise a claim of error on appeal respecting the admission of State exhibit 19.
 

 
 *1034
 
 Archanian references another colloquy in the record concerning a photograph of a satchel belonging to him. The district court indicated that it had previously ruled on the admissibility of the photograph in chambers. In the course of the discussion, counsel clarified that he mistook the photograph of the satchel for another and that he had no objection to the admission of the satchel photograph. Based on the record, we conclude that Archanian fails to demonstrate prejudice or that he was denied meaningful appellate review in this circumstance.
 

 The next instance concerns several photographs of the victims, which the district court, as it announced on the record, had previously viewed in an unrecorded chambers hearing. However, at the conclusion of the presentation of the evidence, the district court allowed counsel to place his objections to several photographs on the record, and counsel did so. On appeal Archanian only challenges the admissibility of State exhibits 69, 71, and 72. Counsel placed his objection to State exhibit 69 on the record; therefore, a record exists from which this court may adequately review his claim. Respecting State exhibits 71 and 72, counsel had the opportunity to make a record of any objection to these two photographs but did not do so. We therefore conclude that Archanian has not demonstrated that he was denied meaningful appellate review in this regard.
 

 Archanian next challenges an exchange on the record in which the State showed a witness State exhibit 7, which the State represented as a picture of Del Prado.
 
 [20]
 
 As the State proceeded to question the witness, counsel objected, and the parties conferred with the district court. This sidebar conference was not recorded. The basis of counsel’s objection is unclear from the transcript. Nothing in the transcript suggests that the district court precluded counsel from making a record of his objection whatever the basis. Moreover, as discussed above, Archanian challenges on appeal the admission of only two photographs of Del Prado to which he did not object at trial. We conclude that Archanian has not demonstrated prejudice resulting from the lack of a recording of this bench conference.
 

 Archanian contends that other off-the-record discussions were held, but does not argue specifically that any prejudice resulted
 
 *1035
 
 from any of them. Although we conclude that Archanian fails to demonstrate prejudice or that he was denied meaningful appellate review in his case, we reiterate SCR 250(5)(a)’s mandate and emphasize the importance of timely placing on the record the gist of sidebar conferences and chambers hearings in which contested matters are resolved or objections made.
 

 Oral instructions to the jury
 

 Relying on
 
 Daniel v.
 
 State,
 
 [21]
 
 Archanian further contends that the district court improperly instructed the jury orally through the bailiff. In
 
 Daniel
 
 the jury foreman sent a note asking the district court what happened in the event of a hung jury and about parole eligibility.
 
 [22]
 
 Without first consulting with counsel, the district court answered the questions by sending the bailiff into the jury room to orally convey the district court’s answers.
 
 [23]
 
 Afterward, the district court informed both parties of the event on the record.
 
 [24]
 
 This court concluded that the district court erred in failing to notify counsel before communicating to the jury on a substantive matter. Though such error is harmless when the instructions given to the jury are correct, the district court failed to make an adequate record for appellate review, so this court could not determine whether the error was harmless.
 
 [25]
 
 This court explained:
 

 The court improperly instructed the jurors orally through the bailiff, rather than in writing or directly in the courtroom on the record. Therefore, the record before us does not reveal the instructions received by the jury, only the district court’s rendition of what it told the bailiff. And most important, exactly what the bailiff said to the jury is unknown.
 
 [26]
 

 This court declined to determine whether this error alone necessitated reversal in light of the many other errors at trial that cumulatively required reversal.
 
 [27]
 

 Here, the district court placed on the record the following event. During penalty deliberations the jury foreman sent the district court the following note, “Judge, is it necessary to check the special verdicts, or can we just choose the two forms that list the four possible penalties?” The district court directed court personnel to contact both parties and ask whether they wanted to be pres
 
 *1036
 
 ent for its instruction to the jury. Both the State and defense counsel agreed that they had been contacted and had informed the district court that it would be appropriate for the district court to inform the jury via the bailiff that it must complete the special verdict. The district court asked the bailiff what he told the jury, to which he replied, “I told them exactly verbatim what you told me to tell them that, yes, they have to fill out the forms.’ ’
 

 Daniel
 
 is distinguishable from this case. Unlike
 
 Daniel,
 
 prior to answering the jury’s question, the district court here consulted with the parties, who did not object to the content of the district court’s instruction or the method of delivery. Nonetheless, we conclude that pursuant to
 
 Daniel,
 
 the district court erred in instructing the jury orally through the bailiff rather than in writing or on the record. Archanian does not argue that this error alone warrants relief. Rather, he contends that this court must consider the cumulative impact of this error in light of the other instances where trial proceedings were not recorded. Considering the record and Archanian’s argument, we conclude that he has not shown prejudice warranting reversal of his conviction on this basis.
 

 Claim of ineffective assistance of counsel
 

 Archanian argues that his counsel was ineffective for failing to call an expert witness to contest the State’s DNA evidence and for not challenging the authenticity of the videotape admitted into evidence. This court has repeatedly declined to consider ineffective-assistance-of-counsel claims on direct appeal unless the district court has held an evidentiary hearing on the matter or an evidentiary hearing would be needless.
 
 [28]
 
 Neither of these exceptions exists here. Therefore, we decline to address this claim.
 

 Miranda rights
 

 Archanian contends that LVMPD Detective Barry Jensen conducted a custodial interrogation of him without a rights advisement, rendering some of Detective Jensen’s testimony inadmissible. As he did not object to the challenged testimony, Archanian failed to preserve this issue for appeal. Therefore, we need not consider this claim absent a showing of plain error.
 
 [29]
 
 Archanian specifically challenges the following portion of Detective Jensen’s testimony:
 

 PROSECUTOR: What did you do?
 

 
 *1037
 
 JENSEN: I got out of my car. Mr. Archanian was out of his car getting ready to put gas in his Sequoia and I had my gun out.
 

 I identified myself as a police officer and I told him that I needed to talk to him.
 

 PROSECUTOR: What happened at that point?
 

 JENSEN: At that point I gave him verbal commands to walk over to my car. I patted him down to make sure he didn’t have any weapons and he asked me what this was about.
 

 PROSECUTOR: What happened at that point?
 

 JENSEN: I told him that he was a suspect in the murder at the jewelry store downtown and immediately after I told him that I saw forms of sweat bead up over his lip and his eyebrows and he told me that he felt weak and, in fact, his knees did buckle and I asked him if he needed to sit down and he said yes.
 

 I asked him if he needed a drink of water and he also shook his head indicating yes.
 

 I set him down in the front seat of Detective LaRochelle’s vehicle, um, the door was — I left the door open and his legs were sticking out of it and I went into the ARCO and bought a bottle of water and provided that — provided him a drink of water.
 

 PROSECUTOR: Did you ask him about his medical condition?
 

 JENSEN: Yes, I did.
 

 I asked him if he had any medical condition which would cause him to feel this way, in case he had a weak heart or other type of medical problem that we would need to get paramedics to respond to the area.
 

 He shook his head, indicating he didn’t have any other medical problems.
 

 Detective Jensen testified that Archanian was not handcuffed during the challenged exchange and that he did not advise Archanian of his Miranda
 
 [30]
 
 rights at that time. He further testified that Archanian made no admissions concerning the murders.
 

 Archanian contends that the interplay described above constituted a custodial interrogation and that Detective Jensen’s words and actions were designed to invoke incriminating responses from him even though Detective Jensen did not expressly question him about the murders. By asking about his medical condition, Archanian asserts that Detective Jensen attempted to elicit incriminating responses from him to discount any reason for him to perspire or become physically weak other than he must have com
 
 *1038
 
 mitted the murders. Thus, Archanian claims, the challenged testimony was inadmissible.
 

 Under
 
 Miranda,
 
 a rights advisement is required when a suspect is subjected to a custodial interrogation.
 
 [31]
 
 “[A]n individual is deemed ‘in custody’ where there has been a formal arrest, or where there has been a restraint on freedom of movement of the degree associated with a formal arrest so that a reasonable person would not feel free to leave.”
 
 [32]
 
 An interrogation for
 
 Miranda
 
 purposes “refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.”
 
 [33]
 
 “A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.”
 
 [34]
 

 We conclude that Archanian was in custody at the time of the challenged exchange. Detective Jensen testified that he “had his gun out’ ’ when he approached Archanian and identified himself as a police officer. He then commanded Archanian to walk over to Detective Jensen’s car, patted Archanian down for weapons, and informed him that he was a murder suspect. A reasonable person under these circumstances would not feel free to leave. However, even assuming Archanian’s physical reaction to being informed of his suspect status and response to Detective Jensen’s inquiry about his physical health constituted incriminating responses, we conclude that Detective Jensen’s words and actions were not designed to elicit any incriminating reply. Rather, Detective Jensen testified that he sought to ascertain what he perceived to be a potential medical problem after informing Archanian of his impending arrest for murder. Such an inquiry was reasonable under the circumstances.
 
 [35]
 
 Moreover, nothing in the record indicates that Detective Jensen should have known that inquiring into Archanian’s medical condition was reasonably likely to elicit an incriminating response, again assuming one could consider his responses incriminating. We therefore conclude that Archanian has not demonstrated plain error.
 

 
 *1039
 

 Mandatory review of death penalty
 

 NRS 177.055(2) requires this court to review every death sentence and independently consider:
 

 (c) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
 

 (d) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
 

 (e) Whether the sentence of death is excessive, considering both the crime and the defendant.
 

 Whether the evidence sufficiently supports the aggravating circumstances
 

 The jury found as an aggravating circumstance in each murder that Archanian had, “in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree.”
 
 [36]
 
 The evidence conclusively supports this aggravating circumstance because the jury found Archanian guilty of the first-degree murders of both Quiroga and Del Prado.
 

 The jury also found the aggravating circumstance that each murder was committed during the commission of or an attempt to commit or flight after committing or attempting to commit a robbery. In
 
 McConnell,
 
 we deemed “it impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated.”
 
 [37]
 
 Here, the State sought a murder conviction based upon the theories of deliberate, premeditated murder and felony murder, and the district court instructed the jury on both theories. The jury’s verdicts are silent as to which theory or theories the jury relied on in finding Archanian guilty of each murder. Therefore, the robbery aggravator is invalid under
 
 McConnell.
 

 Remarkably, Archanian’s counsel did not raise this matter on appeal, although
 
 McConnell
 
 had been decided more than one year prior to the filing of the opening brief.
 
 [38]
 
 We further note that the State inexplicably neglected to address
 
 McConnell
 
 in its answering brief. We remind the
 
 State of its
 
 obligation to disclose to a tribunal legal authority in the controlling jurisdiction known by the
 
 *1040
 
 State to be directly adverse to its position and not disclosed by opposing counsel.
 
 [39]
 

 Under our mandatory review, we conclude that we must apply
 
 McConnell
 
 and strike die robbery aggravating circumstance. The consequence of this determination is discussed below.
 

 Whether the death sentence was imposed under influence of passion, prejudice, or any arbitrary factor
 

 The murders in this case were unquestionably gruesome and horrific. However, nothing in the record suggests that the jury reached its verdict under the influence of passion, prejudice, or any arbitrary factor. Despite Archanian’s contention that several autopsy photographs worked to inflame and prejudice the jury, this evidence was properly admitted. And there is no evidence suggesting that the autopsy photographs improperly influenced the jury to return a death sentence.
 

 Whether the invalid robbery aggravator was harmless and whether the death sentence is excessive
 

 Finally, we must consider whether the death sentence is excessive. Here, we consider the impact of the erroneous robbery aggravating circumstance. A death sentence based in part on an invalid aggravator may be upheld either by reweighing the aggravating and mitigating evidence or conducting a harmless-error review.
 
 [40]
 
 If this court cannot conclude beyond a reasonable doubt that the jury would have imposed death absent the erroneous aggravating circumstance, we must vacate the death sentence and remand the matter to the district court for a new penalty hearing.
 
 [41]
 

 Here, the single remaining aggravator for each murder — that Archanian was convicted in the immediate proceeding of more than one offense of murder — is indisputable and weighty. We are confident that in weighing the aggravating and mitigating circumstances, the jurors considered the fact that Archanian murdered two elderly victims to have greater consequence than the fact that he robbed the victims. The jurors found only one mitigating circumstance— Archanian had no significant history of prior criminal activity. We conclude beyond a reasonable doubt for each murder that the jury
 
 *1041
 
 would have found that the mitigating circumstance did not outweigh the one valid aggravating circumstance, making Archanian eligible for a death sentence.
 

 We further conclude that after considering all of the evidence the jury also would have returned a death sentence even without the second invalid aggravating circumstance. The murders in this case were particularly heinous. Archanian viciously bludgeoned two elderly women to death with a hammer and a 12- to 14-inch metal rod. Moreover, the murders were not committed by an unfamiliar assailant, but rather by someone Del Prado had trusted and welcomed into her business operation. Although the mitigation evidence suggested that these brutal crimes were out of Archanian’s character, we conclude that this evidence was not exceedingly compelling.
 

 CONCLUSION
 

 For the reasons discussed above, we conclude that any errors committed at trial do not warrant relief. Therefore, we affirm the judgment of conviction and sentence of death.
 

 Becker, Maupin, Gibbons, Douglas, Hardesty and Parraguirre, JJ., concur.
 

 [1]
 

 120 Nev. 1043, 102 P.3d 606 (2004).
 

 [2]
 

 Archanian emigrated from Armenia. An Armenian translator assisted him throughout the trial proceedings.
 

 [3]
 

 The blood analysis was conducted using deoxyribonucleic acid (DNA) analysis.
 

 [4]
 

 NRS 200.033(4).
 

 [5]
 

 NRS 200.033(6).
 

 [6]
 

 NRS 200.033(12).
 

 [7]
 

 Crowley
 
 v.
 
 State,
 
 120 Nev. 30, 34, 83 P.3d 282, 286 (2004).
 

 [8]
 

 NRS 48.035(1).
 

 [9]
 

 Vallery
 
 v.
 
 State,
 
 118 Nev. 357, 371, 46 P.3d 66, 76 (2002).
 

 [10]
 

 See
 
 NRS 178.602;
 
 Herman v. State,
 
 122 Nev. 199, 204, 128 P.3d 469, 474 (2006);
 
 Green v. State,
 
 119 Nev. 542, 545, 80 P.3d 93, 95 (2003).
 

 [11]
 

 Anderson v. State,
 
 121 Nev. 511, 516, 118 P.3d 184, 187 (2005);
 
 Kaczmarek v. State,
 
 120 Nev. 314, 328, 91 P.3d 16, 26 (2004).
 

 [12]
 

 Green,
 
 119 Nev. at 545, 80 P.3d at 95.
 

 [13]
 

 Flores v. State,
 
 121 Nev. 706, 722, 120 P.3d 1170, 1180 (2005) (quoting
 
 Turpen
 
 v.
 
 State,
 
 94 Nev. 576, 577, 583 P.2d 1083, 1084 (1978)).
 

 [14]
 

 See, e.g., id.; Castillo
 
 v.
 
 State,
 
 114 Nev. 271, 278, 956 P.2d 103, 108 (1998);
 
 Browne v. State,
 
 113 Nev. 305, 314, 933 P.2d 187, 192 (1997).
 

 [15]
 

 Daniel
 
 v.
 
 State,
 
 119 Nev. 498, 507, 78 P.3d 890, 897 (2003).
 

 [16]
 

 Id.
 
 at 508, 78 P.3d at 897 (quoting
 
 Lopez
 
 v.
 
 State,
 
 105 Nev. 68, 85, 769 P.2d 1276, 1287 (1989)).
 

 [17]
 

 Id.
 

 [18]
 

 Id.; see Hernandez v. State,
 
 118 Nev. 513, 534, 50 P.3d 1100, 1114 (2002).
 

 [19]
 

 Daniel,
 
 119 Nev. at 508, 78 P.3d at 897.
 

 [20]
 

 We note that the record on appeal shows that State exhibit 7 depicts the inside of the World Merchants jewelry store, not a picture of Del Prado as represented in the transcript. As the challenged sidebar hearing occurred during the forensic pathologist’s testimony, the subject photograph appears to be a picture of Del Prado.
 

 [21]
 

 119 Nev. 498, 78 P.3d 890.
 

 [22]
 

 Id.
 
 at 510, 78 P.3d at 898-99.
 

 [23]
 

 Id.
 
 at 510, 78 P.3d at 899.
 

 [24]
 

 Id.
 
 at 510-11, 78 P.3d at 898-99.
 

 [25]
 

 Id.
 
 at 511, 78 P.3d at 899.
 

 [26]
 

 Id.
 

 [27]
 

 Id.
 

 [28]
 

 See Pellegrini
 
 v.
 
 State,
 
 117 Nev. 860, 883, 34 P.3d 519, 534 (2001).
 

 [29]
 

 See
 
 NRS 178.602.
 

 [30]
 

 Miranda v.
 
 Arizona, 384 U.S. 436 (1966).
 

 [31]
 

 Id.
 
 at 444.
 

 [32]
 

 State
 
 v.
 
 Taylor,
 
 114 Nev. 1071, 1082, 968 P.2d 315, 323 (1998);
 
 see Rosky v. State,
 
 121 Nev. 184, 191, 111 P.3d 690, 695 (2005).
 

 [33]
 

 Rhode Island v. Innis,
 
 446 U.S. 291, 301 (1980) (footnote omitted).
 

 [34]
 

 Id.
 

 [35]
 

 See, e.g., People v. Raglin,
 
 21 P.3d 419, 427 (Colo. Ct. App. 2001);
 
 Johnson v. State,
 
 380 N.E.2d 1236, 1240 (Ind. 1978).
 

 [36]
 

 NRS 200.033(12).
 

 [37]
 

 120 Nev. at 1069, 102 P.3d at 624.
 

 [38]
 

 See
 
 RPC 1.1 (mandating that a lawyer must provide to his client competent representation, which requires having “the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation”).
 

 [39]
 

 RPC 3.3(a)(2).
 

 [40]
 

 See Clemons
 
 v.
 
 Mississippi,
 
 494 U.S. 738, 741 (1990).
 

 [41]
 

 See Browning v. State,
 
 120 Nev. 347, 364, 91 P.3d 39, 51-52 (2004);
 
 Leslie v. Warden,
 
 118 Nev. 773, 782-83, 59 P.3d 440, 447 (2002).