UNITED STATES of America,
Plaintiff–Appellee,

v.

Manu PATEL, Defendant–Appellant.

No. 88–2738.

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1989.

Decided July 20, 1989.

Rehearing Denied Aug. 29, 1989.

Order on Denial of Rehearing Sept. 6, 1989.

Caryn Jacobs, Asst. U.S. Atty., Chicago, Ill., David J. Stetler, Asst. U.S. Attys. Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.

Josette Skelnik, Robinson & Skelnik, Elgin, Ill., for Patel.

Before POSNER and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

A jury convicted Manu Patel of four counts of violating federal narcotics law in connection with the importation from India of a ton of hashish having a street value of at least $4 million. The judge sentenced him to seventeen years and six months in prison. The appeal raises a number of issues but the only one that merits discussion is whether Patel was still a member of the conspiracy to import and distribute the hashish at the time his principal co-conspirator, Sheth, made statements that were recorded and later admitted into evidence against Patel; Sheth did not testify.

Customs inspectors had discovered the hashish in a shipment (purportedly of furniture and artifacts) from the Apex Trading Agency of Bombay to Global Impex, Inc., which had the same address as Patel's home in Roselle, Illinois. After the inspection, the shipment was allowed to continue on its way, accompanied however by federal agents. Its interim destination was a warehouse. When Patel arrived with moving trucks to remove the shipment from the warehouse, the agents arrested him and informed him that the crates contained hashish. Patel exhibited surprise, and claiming that he had nothing to hide agreed to cooperate with the government. He told the agents that he and Navin Sheth, a resident of India, were co-owners of Apex Trading Agency, that this was the third shipment he had received from Sheth, and that the previous ones had consisted of

spices and groceries. Patel volunteered that Sheth was planning to phone him shortly from India with instructions for the distribution of the latest shipment. He added that after each of the first two shipments Sheth had come to Roselle to inspect the shipments, and together with two other Indians, one named Raji, had carried away parts of the shipments in a U–Haul truck before Patel distributed the rest.

The agents wanted Patel to make recorded phone calls to Sheth in which Patel would tell Sheth that a crate had broken open during the unloading of the shipment and had spilled hashish. The agents insisted that Patel use the word "hashish" in the calls. The phone conversations, conducted in an Indian dialect, were recorded, translated, and transcribed, and the transcripts were introduced into evidence at Patel's trial, over his objection. In the first and most important of the calls, after telling Sheth about the spill of the hashish, Patel asked, "Who is going to call?" Sheth was taken aback: "Didn't I tell you Tuesday morning?" Patel played dumb: "Tuesday morning? Somebody is going to call? ... You? Would you call?" "No, I wouldn't call. He will call you." "But, who is he?" To which Sheth replied: "Why you have been told about it? Why did you forget?" Patel: "Raj, Raj, Raj." Sheth: "You are Raj Kumar." As the call continued, Sheth became increasingly suspicious. He asked, "why are you using that word?" (presumably "hashish"). He added, "You know about all this to be not using them." In later calls, Sheth, swallowing his suspicions, gave Patel directions for the distribution of the hashish. As a result of the information conveyed by Sheth in these calls, as well as information obtained in calls that Patel made at the government's direction to members of the ring in the U.S., the other members—all but Sheth— were arrested. Sheth remained in India, and for reasons that no one has been able to explain to us cannot be extradited to the U.S. to stand trial for his part in the conspiracy.

■ The transcripts of the calls to Sheth exploded Patel's pretense of being an un-knowing recipient of the hashish, and although there was other evidence of his involvement in the smuggling ring the government does not argue that the admission of the transcripts, if error, was harmless. The "theory" under which a co-conspirator's out-of-court statement is admissible is that each member of the conspiracy is the agent of every other member, and an agent's admission binds his principal. See Fed.R.Evid. 801(d)(2)(E); *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *United States v. Ammar*, 714 F.2d 238, 255–56 (3d Cir.1983). The Advisory Committee's Note remarks the fictitious character of the agency rationale but does not question the rule. Patel, noting that the rule requires that the co-conspirator's statement be made "during the course and in furtherance of the conspiracy," Fed. R.Evid. 801(d)(2)(E); see also *Krulewitch v. United States*, 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949), argues that when he made the calls to Sheth at the government's behest, he had quit the conspiracy, so Sheth was no longer his agent.

■ There is nothing in the rule about withdrawal, and of course a conspiracy could continue, and statements be made in the course and furtherance of it, after a particular member had withdrawn. But then it would not be a co-conspirator's statement; it would be a former co-conspirator's statement. See *United States v. Mardian*, 546 F.2d 973, 978 n. 5 (D.C.Cir. 1976); *United States v. Abou–Saada*, 785 F.2d 1, 8 (1st Cir.1986); *cf. United States v. Smith*, 578 F.2d 1227, 1233 (7th Cir. 1978). At all events, the government does not argue the point, but instead replies to Patel's claim that he had withdrawn from the conspiracy before the call by arguing that the only way to quit a conspiracy is to confess involvement in it to the government or to notify your fellow conspirators that you're quitting. Pressed at argument, the government's counsel reluctantly conceded that death might be a third way out, but she would acknowledge no other modes of exit. Since Patel did not die and since the government did not want him to announce his withdrawal from the conspiracy to Sheth and the other conspirators, the

government's position is that the only way Patel could quit the conspiracy after being arrested was by confessing.

As an original matter this conclusion might be questioned. A conspiracy is an agreement, but it is an agreement without formalities, and an agreement made informally can be dissolved informally. The same applies to the collateral agreement joining a particular individual to the conspiracy. All that would be required for withdrawal, one might think, would be proof that the individual was no longer a party. Making a clean breast to the government is one way of indicating that one has quit—although it is not conclusive, for one might make a clean breast one day and repent of it the next and resume participation in the conspiracy. Notifying one's co-conspirators that one has quit is another way. Death is a third. One supposes there could be others. Patel contends that while he did not confess his involvement in the conspiracy, he certainly took himself out of it by cooperating fully with the government; that once he turned informant he was no longer a member of the conspiracy; and that he did everything the government wanted him to do to undermine the conspiracy and bring its remaining members to justice.

This is not a bad argument. And the government may be short-sighted to claim a right to use an informant's recorded calls in evidence against him: the existence of such a right would increase the risk of turning informant, and without informants the government's efforts to stop the drug traffic would be entirely futile. All this said, however, we think the district court was correct to deny Patel's motion to exclude Sheth's statements.

There are two points, one evidentiary and one substantive. The evidentiary point is that the very absence of formalities required for a conspiracy makes it more difficult than in a formal contract to know when an individual's participation has ceased. A period of quiescence cannot be equated with a clean break.

The substantive point is that having set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however definitively, to participate. Such cessation may or may not be effective withdrawal in a lay sense, but this is one of those places where the law uses a word in a special sense. You do not absolve yourself of guilt of bombing by walking away from the ticking bomb. And similarly the law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation. The courts hold that for withdrawal to limit a conspirator's liability and (the novelty of the present case) his exposure to statements by co-conspirators, "mere cessation of activity is not enough ...; there must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators. And the burden of withdrawal lies on the defendant." *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964) (Friendly, J.) (citation omitted).

This formulation—endorsed implicitly in *United States v. United States Gypsum Co.*, 438 U.S. 422, 463–65, 98 S.Ct. 2864, 2886–88, 57 L.Ed.2d 854 (1978), and explicitly in many cases in this and other circuits, see, e.g., *United States v. Dorn*, 561 F.2d 1252, 1256 (7th Cir.1977) (per curiam); *United States v. Andrus*, 775 F.2d 825, 850 (7th Cir.1985)—closes the door on Patel's argument. See also *United States v. Juodakis*, 834 F.2d 1099, 1102–03 (1st Cir. 1987). Patel did not communicate his abandonment to any of his co-conspirators and he did not make a clean breast to the authorities. On the contrary, his efforts to exculpate himself in his first call to Sheth aroused Sheth's suspicions, reducing the likelihood that Sheth would come to the United States and be bagged with the rest of the conspirators. And, judging by the tenor of the phone calls, Sheth was the kingpin of the smuggling ring. Granted, the government was maladroit in instructing Patel to use the word "hashish." But this was not the only signal likely to arouse Sheth's suspicions, and the others were the initiative of Patel, who may have been trying to warn Sheth while obscuring his own complicity, and was certainly trying to do the latter.

As pointed out in *Borelli* and *Juodakis*, at some point after a conspirator's active involvement in the conspiracy ends it becomes unreasonable to hold him responsible for the acts of the remaining conspirators. But that precept is not applicable here. The statements made by Sheth that incriminated Patel were made at the time when the scheme for the importation and distribution of the shipment of hashish was *in medias res*, and were in furtherance of the conspiracy, see *Garlington v. O'Leary*, 879 F.2d 277, 282–285 (7th Cir.1989), albeit the conspirators no longer had a realistic prospect of success.

AFFIRMED.

### ORDER

The petition for rehearing complains about the failure of the court to discuss every issue raised by the appeal. When issues patently lack merit, the reviewing court is not obliged to devote scarce judicial resources to a written discussion of them. In the present case, the court, having carefully considered each of the issues raised by the appeal, confined its opinion to the sole issue having arguable merit. Having studied the papers filed in connection with the petition for rehearing, the court is satisfied that the remaining issues indeed lack merit and do not require discussion. The petition is therefore DENIED.