951 P.2d 591 (1997)
Michael Joseph SILVA, Appellant,
v.
The STATE of Nevada, Respondent.
No. 27738.
Supreme Court of Nevada.
December 30, 1997.
*592 Steven G. McGuire, State Public Defender, Nancy M. Lemcke, Deputy, Carson City, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City, Stewart L. Bell, District Attorney, James Tufteland, Chief Deputy, Robert Daskas, Deputy, Clark County, for Respondent.

OPINION
YOUNG, Justice.
On March 12, 1992, the Wagon Wheel Bar was robbed and the bartender, Howard Gibbons, was found dead after being stabbed in the back. Preliminary police investigations led police officers Donald Dibble ("Dibble") and Steven Scholl ("Scholl") to suspect the involvement of appellant Michael Joseph Silva ("Silva") and Brian Loehr ("Loehr"). The officers proceeded to the apartment of Silva's girlfriend, Phyllis Vialpando. They questioned her inside her apartment until she noticed that Silva and his sister, Audrey Gabriel ("Gabriel"), arrived outside the building. The officers went downstairs to speak with Silva. Dibble asked Silva if he would mind accompanying him and Scholl to the police station. Silva cooperated and went with them while Gabriel followed in her car.
Dibble and Silva proceeded directly to an interview room used generally for questioning witnesses or suspects. A transcript of the initial taped discussion ("the first statement") revealed that Dibble questioned Silva regarding his whereabouts and whether he attended the Wagon Wheel Bar the previous evening. Silva insisted that he had nothing to do with the robbery or murder.
Dibble then left the room for approximately fifteen minutes and returned, again taping their conversation ("the second statement"). Dibble insisted that he would find out that Silva was, indeed, involved in the crime. Excerpts of the second statement are as follows:
Q: Okay here's what we're gonna get down to now, okay, first of all I want you to understand one thing, you are not under arrest, you understand that?
A: Okay.
Q: I am not arresting you for any crime of any kind at this time, when we're done with this, unless something drastically changes, you and I don't have a real problem right now, you understand?
. . . .
Q: You sure you want to stick with that? You're absolutely certain that you want to stick with that?
A: Unless you're gonna charge me with something, I see a lawyer or something, but I didn't do nothing.
Q: Is that what you want to do? What do you want to do?
A: I don't know, what are you talking about? I don't know, you're putting all this on me and . . .
Q: Well I'm giving you a chance to get your side of it out on the table, that's what I'm giving you. Now if you want to talk to a lawyer, all you gotta do is tell me so. That's real simple, you know what your rights are I assume, you know, if you want to talk to a lawyer . . .
A: It's been years since I've been in trouble with the police and I, I don't know what to do and you're sitting here accusing me of it.
Q: Well I'm saying you were there but what all I want to get straight right now is if you want to talk to a lawyer, we'll get you one or if you want to talk to me that's fine too, I, it's up to you, I'm gonna leave that whole decision up to you.
A: I mean I don't, I didn't do nothing I really don't need a lawyer right.
Q: Well that's what do you think, you know, you don't think you need one or you do think you need one.
A: I don't think I need one right now but
. . .
Q: You don't think you need one right now.
Silva then made incriminating statements regarding his and Loehr's involvement with the robbery and murder. Afterward, the following conversation took place:

*593 Q: Well do you think that maybe we ought to start over and get a complete statement from you.
A: ______.
Q: I'm sorry what?
A: Can I have a lawyer here?
Q: That's up to you. Do you want a lawyer?
A: ______.
Q: You tell me.
A: If I'm in trouble, I think I should.
Q: Okay. Well if you want a lawyer, I'll go and get you one. Why don't we just take it easy here for a moment.
A: Can I talk to my sister?
Q: Yeah, I'll get your sister, she's out front waiting for you.
Gabriel entered the interview room, and Dibble left them to speak alone. Gabriel and Silva claim they spoke for only four to eight minutes before Dibble returned, while Dibble claims they were alone for thirty to forty-five minutes. After Dibble re-entered the room, Scholl entered; then Dibble left. Scholl arrested Silva and gave him a Miranda rights card. Silva read the card and signed a waiver of his rights. At that time, Scholl began tape recording the conversation ("the third statement"). At the beginning of this statement, Scholl informed Silva that he was not free to go and ensured that Silva understood his rights. Silva then made incriminating statements.
On April 12, 1994, and September 30, 1994, Silva filed his motions to suppress all his statements. Trial took place on June 26 through June 30, 1995. In the middle of the trial, outside the presence of the jury, the district court conducted an evidentiary hearing on the motions. Dibble, Gabriel, and Scholl testified. At the conclusion, the judge denied Silva's motions and allowed all three taped statements to be admitted.
Also during trial, Loehr testified for the prosecution in the presence of the jury. He stated that he would not be answering any questions regarding the case. The prosecutor elicited Loehr's reasons: he would be labeled a "snitch" in prison if he stated anything about the case. Being a "snitch" would result in possible retaliation by fellow inmates. Loehr explained that he was not keeping silent for Silva's benefit and did not care about Silva one way or the other. Rather, he was protecting himself, and only himself, by refraining from giving information. The court held Loehr in contempt seventeen times for refusing to answer questions. However, Loehr did answer many questions as long as they did not pertain to the evening or events at issue.
At the conclusion of trial, the jury returned guilty verdicts for robbery with a deadly weapon, first degree murder with a deadly weapon, and burglary. On August 10, 1995, Silva was sentenced to twenty years for robbery with a deadly weapon, two life sentences with the possibility of parole for the murder conviction, and eight years for burglary. On August 15, 1995, Silva filed his notice of appeal.

Admissibility of Silva's statements
To be admissible, a confession must be freely and voluntarily given, without compulsion or inducement. Passama v. State, 103 Nev. 212, 213, 735 P.2d 321, 322 (1987). Silva contends his confessions were not voluntarily provided to the police due to the officers' allegedly coercive tactics during interrogation. At trial, Silva testified that he made the incriminating statements only because he was allegedly told that if he implicated Loehr in the crime, then the police would let him go home. Additionally, Gabriel testified that Silva was crying hysterically when she saw him after the second statement.
Thompson v. State, 108 Nev. 749, 753, 838 P.2d 452, 455 (1992), held that the district court's finding of voluntariness would be upheld unless it was clearly untenable. Thompson further held that this court uses a "totality of the circumstances" test to determine whether a confession was voluntary or "obtained by physical intimidation or psychological pressure." Id. Silva claims his confession was coerced by the police due to the allegedly "obvious threats and unduly coercive nature of Dibble's suggestions."
In Passama, this court held the appellant's confessions were involuntary when appellant *594 was questioned for five hours, deprived of food and drink, and denied his request to speak with his fiancee. Passama, 103 Nev. at 214-15, 735 P.2d at 323. Further, the police promised him leniency if he cooperated, but these promises were employed only to trick appellant into confessing. Id. at 215, 735 P.2d at 323.
In the present case, Silva was questioned for approximately one to two hours and was allowed to speak with his sister when he requested. No evidence was provided that he was deprived of food or drink. In addition, Dibble made a point of saying that he could not make any promises to Silva.
However, Silva contends that Dibble deceived him by stating that the police already had conclusive evidence of Silva's guilt. This court recently held that lying to an interrogee about the strength of the evidence against the defendant is, in itself, insufficient to make the confession involuntary. Sheriff v. Bessey, 112 Nev. 322, 325, 914 P.2d 618, 619 (1996). Specifically, "`a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.'"Id. at 325, 914 P.2d at 620 (emphasis added) (quoting Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir.1992), cert. denied, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993)).
With respect to Silva's claim that Dibble told him he could go home if he implicated Loehr, the transcripts do not so indicate. Dibble stated, "I am not arresting you for any crime of any kind at this time, when we're done with this, unless something drastically changes, you and I don't have a real problem right now." At this point in the interrogation, Dibble was concerned with Loehr's participation in the crime and was seeking information from Silva to confirm that. Only after Silva incriminated himself did "something drastically change." Additionally, nowhere in the transcripts did Dibble specifically state that Silva could go home if he told the police about Loehr. Accordingly, like in Bessey, the totality of the circumstances leads us to the conclusion that Silva's confessions were not coerced.
Next, Silva contends that he requested an attorney during his second statement, but Dibble ignored him and continued to question Silva in violation of his Fifth Amendment right to counsel.
This right attaches only when the suspect is subjected to custodial interrogation. State v. Ronnebaum, 449 N.W.2d 722, 724 (Minn.1990). We conclude that Silva was not in custody at the time he apparently requested an attorney.
The test for whether one is in custody is if a reasonable person would believe he was free to leave. Rowbottom v. State, 105 Nev. 472, 480, 779 P.2d 934, 939 (1989). Silva contends he reasonably believed he was not free to leave because he was in a very small interview room at the police station and Dibble "threatened" him by stating that the police would eventually prove Silva's involvement. We disagree.
To begin, the very first thing that Dibble told Silva during the second statement was that Silva was not under arrest. Dibble additionally ensured that Silva understood this fact.
Second, California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983), held that Miranda rights need not be provided simply because the questioning took place at the police station or because appellant was the person the police suspected of the crime. Beheler also noted that the appellant voluntarily accompanied the police to the station to be questioned. Id. at 1123, 103 S.Ct. at 3519. Likewise, Silva voluntarily went to the police station with Dibble and Scholl. Just because the questioning took place there does not automatically mean that he was in custody. Accordingly, after a review of the record and, in particular, the transcript of the second statement, we conclude that Silva was not in custody at that point.
It is well settled that one who is not in custody is not entitled to the Fifth Amendment right to counsel. Therefore, the police may continue asking the suspect questions, even if he asks for an attorney during the interrogation, as long as the statements are voluntary. Minnesota v. Murphy, 465 U.S. 420, 424 n. 3, 104 S.Ct. 1136, 1140 n. 3, 79 *595 L.Ed.2d 409 (1984); State v. Stanley, 167 Ariz. 519, 809 P.2d 944, 950 (1991), cert. denied, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991); Ronnebaum, 449 N.W.2d at 724; State v. Fry, 61 Ohio App.3d 689, 573 N.E.2d 1108, 1109-10 (1988).
Since Silva was not in custody during his second statement, Dibble was not required to discontinue questioning if Silva asked for an attorney. Only if he were subjected to custodial interrogation would a request for an attorney require the police to immediately cease all questioning until an attorney is present. Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Therefore, because Silva was not in custody, he had no Fifth Amendment right to counsel to assert. Accordingly, we conclude that Dibble did not violate Silva's rights and the district court did not err by admitting the second statement.
Shortly after Silva requested an attorney during his second statement, he asked to see his sister. Silva and Gabriel met for approximately thirty to forty-five minutes before Dibble and Scholl entered the room. Dibble left and Scholl arrested Silva. Scholl then gave Silva a Miranda rights card which Silva read. Silva then signed a waiver of his Miranda rights. Thereupon, Scholl started the tape for Silva's third statement.
Silva argues that because he requested an attorney at the end of the second statement, Scholl was not permitted to question him further for the third statement. We conclude that this argument is without merit.
Even if admission of the second statement violated Silva's rights, which we conclude it did not, that does not automatically preclude admission of his subsequent statement if he was given his Miranda warnings prior to the third statement. Oregon v. Elstad, 470 U.S. 298, 308, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985). Here, Silva was provided with his Miranda warnings prior to making any incriminating remarks during his third statement.
Further, at the commencement of the third statement, Scholl ensured that Silva understood that he was arrested and was not free to leave. If Silva did not wish to communicate to the police except with an attorney present, he could have simply told this to Scholl when Silva read his rights. McNeil v. Wisconsin, 501 U.S. 171, 180, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991). Accordingly, we conclude that the district court did not err by admitting the statements Silva made to the police.

Loehr's testimony
Silva contends that the trial court erred by permitting Loehr to continue testifying after repeatedly holding him in contempt for refusing to answer the prosecutor's questions. He asserts that since Loehr already admitted on the stand that he pleaded guilty to the robbery and murder, the implication of Loehr's subsequent refusal to answer questions was that Silva and Loehr were together on the night at issue. Silva further claims that by allowing Loehr to continue testifying despite his refusal to answer questions, the court permitted the prosecution to suggest Silva's involvement in the crimes. We agree. Accordingly, we reverse Silva's conviction and remand for a new trial.
In Douglas v. Alabama, 380 U.S. 415, 416, 85 S.Ct. 1074, 1075, 13 L.Ed.2d 934 (1965), the defendant, Douglas, and his co-defendant, Loyd, were tried separately for assault with intent to commit murder. Loyd was tried first and found guilty. The prosecutor in Douglas' trial called Loyd to the stand to testify about a statement he had previously made to the police, implicating Douglas as the person who shot the victim. However, once on the stand, Loyd refused to answer any questions on self-incrimination grounds. The trial judge ordered Loyd to answer the questions and threatened to hold him in contempt if he refused. Loyd still insisted on not answering any questions. Rather than hold him in contempt, the judge granted the prosecutor's request to treat Loyd as a hostile witness. The prosecutor proceeded to read the entirety of Loyd's previous police statement to the jury. Id.
The United States Supreme Court held that Douglas' "inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." Id. at *596 419, 85 S.Ct. at 1077. The Court concluded that the inference resulting from the prosecutor's reading of the statement could not be tested on cross-examination by Douglas, nor could Loyd be cross-examined on the statement because he did not admit to making it. Id. Further, the Court determined that the prosecutor's reading of the statement "may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true."[1]Id. Accordingly, the Court concluded that "`inferences from a witness's refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" Id. at 420, 85 S.Ct. at 1077 (quoting Namet v. United States, 373 U.S. 179, 187, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963)); see also Fletcher v. United States, 332 F.2d 724 (D.C.Cir.1964).
Relying on Douglas, we conclude that Silva was denied his right of cross-examination under the Confrontation Clause. Loehr's silence regarding the night in question and Silva's involvement in the crimes for which Loehr was convicted created an implication that Silva was guilty of the charges filed against him. However, because defense counsel could not cross-examine these implications, we conclude Loehr's refusal to answer "added critical weight to the prosecution's case." Douglas, 380 U.S. at 420, 85 S.Ct. at 1077. Further, although the trial court in Douglas did not hold Loyd in contempt, we conclude that the instant matter, where Loehr was held in contempt seventeen times in the presence of the jury, was an even more egregious violation of Silva's rights. Therefore, we conclude that the district court improperly allowed the direct examination to continue. At the very least, when it became apparent that Loehr was not going to answer questions even under the threat of contempt charges, the judge should have discontinued the questioning and investigated the matter outside the presence of the jury. Accordingly, we reverse this matter and remand for a new trial consistent with this opinion.
SPRINGER, J., concurs.
SHEARING, Chief Justice, with whom ROSE, Justice, joins, concurring:
I would reverse Silva's judgment of conviction, but on a different ground than that proposed by the majority. I do not agree that the repeated refusals of the witness Loehr to testify violated Silva's right to cross-examine a witness. I believe that Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), is distinguishable. In Douglas, a codefendant witness, who had been tried and convicted, invoked the self-incrimination privilege. Id. at 416, 85 S.Ct. at 1075. The witness was an essential element of the State's case against the petitioner. During the examination of the witness, the prosecution read a confession attributed to the witness, ostensibly to refresh his memory. The Supreme Court held that "effective confrontation of [the witness] was possible only if [he] affirmed the statement as his" and "inferences from [the] witness's refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination." Id. at 420, 85 S.Ct. at 1077. The court held that the petitioner's inability to cross-examine the witness violated the confrontation clause and reversed the conviction. The situation in Silva's case is quite different. There were no statements attributed to Loehr which implicated Silva. Thus, there were no statements which called for cross-examination. The confrontation clause was not even invoked, since no inculpatory statements were presented which purportedly were made by Loehr; he simply refused to testify. Neither was Loehr an essential element of the prosecution's case. The State called eighteen witnesses and produced physical evidence, including fingerprints, that placed Silva at the scene of the crime. Alone, Loehr's refusal to testify did not add critical weight to the prosecution's case in a form not subject to cross-examination. See Namet v. United *597 States, 373 U.S. 179, 186, 83 S.Ct. 1151, 1154-55, 10 L.Ed.2d 278 (1963). Silva's due process rights were not violated by Loehr's refusal to testify.
The question remains, however, whether there was prosecutorial misconduct. Prosecutorial misconduct occurs "when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege," such as putting a witness on the stand knowing he intends to invoke the privilege, or making inferences to the jury regarding a witness's refusal to testify. Id. at 186, 83 S.Ct. at 1154-55.
It appears that the prosecutor knew before he put Loehr on the stand that he would refuse to testify. When Loehr first stated "I am not answering further questions," the prosecutor immediately replied "because you don't want to be a snitch up at jail, right?" That certainly indicates that the prosecutor was not surprised by Loehr's refusal to testify, but does not indicate a flagrant attempt to build his case on inferences.
However, in closing argument, the prosecutor discussed Loehr's failure to testify extensively. The prosecutor made the following statements in closing argument:
Brian Loehrof course, we just brought Brian Loehr in from the Nevada State Prison so we could give him four hundred and some odd days of contempt time, but his testimony means absolutely nothing else. Well, if Michael Silva's story was true, the man could have got up there and he could have said Michael didn't have anything to do with it. I left him after the Sunrise Cedars Bar and I didn't see him again. Would have saved him a lot of time in the detention center. Would have avoided the whole snitch jacket thing and according to the defendant it would have been the truth. Oh, there's that darn truth again. Hate to use that.
. . .
Now, Brian Loehr, we knowwe know why he had an easy way out. He could have said consistent with the defendant's version, yeah, Mike didn't have anything to do with it. He went home. I didn't see him again. Me and Ricky Smithsome guy I don't remember his name. Nobody knows his name in this caper. You know, me and that guy did the robbery and killed the guy. But he didn't. He didn't say that the defendant wasn't involved. Now you know why he got up there and did what he did because it's a long time before he's coming up for any kind of parole and to walk the yard in the Nevada State Prison knowing he just came down and snitched somebody off, that's a long timethat's a long time to look over your shoulder every day for the next seventeen years or so.
That's not his fault. It's not his fault that he doesn't want to be a snitch, but you judge his credibility. He talked. He mentioned a lot of stuff. He mentioned Mike. He mentioned living there, but when it came close, he didn't say anything. He took his contempt. But he sure did not say Mike wasn't involved. Now, how would that have branded him a snitch? It seems to me if there's anything to this misguided prison code is that if he comes down and says the guy didn't do it, if there's any honor among thievesif there's any code that would have helped him out, he didn't say that, did he? Why didn't he just lie? I don't know the code, but what I do know is that he did not exonerate the defendant.
Clearly the prosecutor was encouraging the jury to make a decision based on Loehr's refusal to testify.
The Namet court noted that "courts have failed to find reversible error when such incidences were `no more than minor lapses through a long trial'. . . [a]nd even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error." Id. at 187, 83 S.Ct. at 1155. (quoting United States v. Hiss, 185 F.2d 822, 832 (2d Cir.1950)). I cannot view the comments made by the prosecutor during closing argument as a minor lapse. The prosecutor was asking the jury to draw inferences against Silva on the basis of Loehr's appearance at trial, when Silva had no opportunity to cross-examine Loehr. When Loehr refused to testify, the prosecutor himself supplied *598 the reason for not testifying as Loehr's unwillingness to be a "snitch". Then the prosecutor used that rationale to argue that if Silva wasn't involved, Loehr would have said so and wouldn't have been a "snitch". The jury is most likely to remember the inferences and incorporate them into their deliberations when they come at the close of trial without any limiting instruction. Despite the abundance of other evidence presented, I do not view this prosecutorial misconduct as harmless error and therefore would reverse this case on that ground.
MAUPIN, Justice, dissenting:
I agree with the concurring opinion as to the error committed with regard to Loehr's testimony and the arguments of trial counsel for the State. However, the evidence of guilt was so overwhelming that the error is harmless.
NOTES
[1] The Supreme Court specifically declined to determine whether Loyd properly invoked his Fifth Amendment right not to incriminate himself. Douglas, 380 U.S. at 420, 85 S.Ct. at 1077.