132 Nev., Advance Opinion 23

IN THE SUPREME COURT OF THE STATE OF NEVADA

DEANGELO R. CARROLL,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 64757

**FILED**

APR 0 7 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from an amended judgment of conviction for conspiracy to commit murder and first-degree murder with a deadly weapon. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed.*

Mario D. Valencia, Henderson,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Marc P. DiGiacomo and Jonathan E. VanBoskerck, Chief Deputy District Attorneys, Clark County,
for Respondent.

_____

BEFORE PARRAGUIRRE, C.J., DOUGLAS AND CHERRY, JJ.

*OPINION*

By the Court, CHERRY, J.:

In this opinion, we focus on whether the district court erred when it admitted Deangelo Carroll's inculpatory statements to the police. Carroll was not advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and he claims he was subject to a custodial interrogation.

4/30/16: Corrected per letter to publishers. CT

16-10870

The State of Nevada claims that *Miranda* warnings were not necessary because Carroll spoke with the police voluntarily. We conclude that the district court erred in denying Carroll's motion to suppress his statements to police because police subjected Carroll to a custodial interrogation without advising him of his *Miranda* rights. Nonetheless, we conclude that the error was harmless beyond a reasonable doubt, so we decline to reverse these convictions.

### FACTS AND PROCEDURAL HISTORY

On May 19, 2005, police discovered Timothy J. Hadland's body on Northshore Road near Lake Mead. Along with Hadland's body, police found advertisements for the Palomino Club. Hadland was fired from his job at the Palomino Club a week before his death. Palomino Club management recruited Carroll to "knock[ ] off" Hadland because Hadland was spreading negative rumors about the club.

Carroll was also an employee at the Palomino Club. Carroll used the club's van to promote the club by handing out flyers to cab drivers and tourists. On the night of Hadland's murder, Carroll drove the club's van with two other men, Rontae Zone and Jayson Taoipu, who occasionally assisted him. Carroll recruited Kenneth Counts for this assignment because Carroll knew Counts would "take care of" someone for money.

Carroll, Zone, Taoipu, and Counts went to an area near Lake Mead, and Carroll called Hadland. When Hadland noticed the Palomino Club's van, Hadland parked his car in front of the van and walked to the driver's side window where Carroll was sitting. As Hadland and Carroll talked, Counts exited the van through the side door, snuck around to the front, and fired two shots into Hadland's head. Counts then jumped back into the van and ordered Carroll to return to town.

Carroll drove directly to the Palomino Club and told club management what occurred. Louis Hidalgo, Jr., the general manager of the club, directed other employees to give Carroll $6,000 in cash to pay Counts. Carroll gave the money to Counts, who then left in a cab. The next morning, at Hidalgo's direction, Carroll bought new tires for the van and disposed of the old tires at two separate locations.

The evening after Hadland's murder, homicide detectives contacted Carroll at the Palomino Club, as Carroll's phone number was the last phone number on Hadland's phone. When the detectives asked to speak with Carroll, he agreed, and the detectives drove Carroll to the homicide office for questioning. Carroll sat in a small room at a table with his back to the wall, while the detectives sat between him and the exit. The detectives did not give Carroll *Miranda* warnings before questioning him, but they informed Carroll that he was speaking with them voluntarily. Eventually, Carroll implicated himself, Palomino Club management, and Counts in Hadland's murder.

Carroll then volunteered to wear a recording device to corroborate his story by speaking with the Palomino Club management. The detectives strategized with Carroll before he spoke with the management each time. The information on these recordings allowed the State to charge three members of Palomino Club management for their roles in Hadland's murder.

After the detectives finished obtaining information and evidence from Carroll, they arrested him. The State's information charged Carroll with conspiracy to commit murder and murder with use of a deadly weapon.

After seven days of trial, the jury returned a guilty verdict on all charges. The jury subsequently returned its penalty verdict and recommended a sentence of life with the possibility of parole. The district court ultimately sentenced Carroll to 36-120 months on the conspiracy conviction, life with the possibility of parole after 20 years for the first-degree murder conviction, and life with the possibility of parole after 20 years, consecutive, for the deadly weapon enhancement.

## DISCUSSION

On appeal, Carroll argues that: (1) the wire recordings should not have been admitted against him at trial because they were not relevant, were prejudicial, consisted of inadmissible hearsay, and violated his right against self-incrimination; (2) the district court erred when it admitted his statements to the detectives because the detectives violated *Miranda* and coerced his statement; (3) there was insufficient evidence to support the convictions for conspiracy to commit murder, first-degree murder, and the deadly weapon enhancement; and (4) cumulative error warrants reversal.

*Wire recordings*

*Whether the relevance of the recordings was substantially outweighed by unfair prejudice*

Carroll argues that the district court abused its discretion by admitting wire tape recordings because they were not relevant to his guilt or innocence and were unfairly prejudicial.[1] He explains he was playing a

---

[1]The State's argument that because Carroll referenced the recordings in his closing argument, he cannot attack their relevance now is unpersuasive. No defendant should be expected to ignore damning evidence against him even if he disagrees with its admissibility.

SUPREME COURT
OF
NEVADA

(O) 1947A

role fed to him by detectives, so a juror could not discern which statements Carroll fabricated and which statements the detectives fed him.

Carroll did not object based on relevance or prejudice; thus, this court reviews for plain error. *Baltazar-Monterrosa v. State*, 122 Nev. 606, 614, 137 P.3d 1137, 1142 (2006). Under the plain error standard, this court only reverses a decision if the error affects the appellant's substantial rights. *Rimer v. State*, 131 Nev., Adv. Op. 36, 351 P.3d 697, 715 (2015).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS 48.015. Evidence that is not relevant is simply inadmissible. NRS 48.025. Even if relevant, evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." NRS 48.035.

Here, Carroll's argument that the recordings were not relevant is without merit. Even under Carroll's account of the facts, the purpose of the recordings was to get the managers of the Palomino Club to corroborate Carroll's claim that he was supposed to beat up Hadland, not kill him. If the recordings accomplished exactly what Carroll wanted, they would have made it less probable that Carroll intended for Hadland to die. Unfortunately for Carroll, there was evidence on the tapes to support both his position that this was never meant to be a killing, and the State's position, that it was.

Carroll's argument that the tapes' probative value was substantially outweighed by their unfairly prejudicial effect also fails. The central issue of this case was Carroll's intent before and during the

shooting. Any evidence allowing the jurors to ascertain his intent is extremely probative. Further, the jury heard the proper context for Carroll's statements—that the tapes were made as part of the investigation, Carroll wore the wire to get incriminating information from the other players, and his statements were fabrications. Because the probative value was great, and the danger of unfair prejudice or confusion was mostly, if not completely, explained away, we conclude that the district court did not commit plain error when it admitted the tapes.

Because Carroll is unable to demonstrate plain error, we conclude that the district court did not plainly err when it admitted the recordings at trial. We so conclude because relevancy is a very broad standard and the tapes could prove Carroll's intent. Also, because Carroll's intent was the primary issue at trial, the probative value is not substantially outweighed by the unfairly prejudicial effect.

*Whether Carroll's statements were inadmissible hearsay*

Carroll argues his statements on the recordings were not his own but those of a state actor. He further argues that it would be absurd for the police to feed a person lines, then use those lines against that person at trial. The issue before us is whether the wire recordings were inadmissible hearsay.

Carroll did not object at trial based on hearsay, thus, this court reviews only for plain error. *Baltazar-Monterrosa*, 122 Nev. at 614, 137 P.3d at 1142.

Hearsay is any out-of-court statement offered to prove the truth of the matter asserted. NRS 51.035. Hearsay is generally inadmissible, unless there is a statutory exception. NRS 51.065(1). A party's own statement offered against that party is not hearsay. NRS 51.035(3)(a). Also, a party's statement offered to provide context to

Supreme Court
OF
Nevada

(O) 1947A

another person's statement, rather than for its own truth, is not hearsay. *Wade v. State*, 114 Nev. 914, 917-18, 966 P.2d 160, 162-63 (1998), *opinion modified on denial of reh'g*, 115 Nev. 290, 986 P.2d 438 (1999).

Carroll's argument that his statements were inadmissible hearsay is not supported by the evidence. The State offered the statements to provide context to those of the Palomino Club managers. Further, had the State offered Carroll's statements for their truth, they would still be admissible as statements of a party pursuant to NRS 51.035(3)(a). Carroll claims the detectives told him what to say, but the evidence at his trial showed the detectives simply assisted with general subject matter; Carroll decided what to say and how to say it. Carroll's recording device could not transmit live audio, so the detectives could not communicate with Carroll while he recorded. Accordingly, we conclude that the wire recordings were admissible because there is no evidence before this court at this time indicating the police directly instructed Carroll what to say. We also conclude that the recordings were admissible because Carroll's statements were not offered to prove their truth.

*Whether the statements of the managers of the Palomino Club were made in furtherance of the conspiracy*

Carroll argues the statements of the Palomino Club's managers on the wire recordings were not admissible because the statements were not made in furtherance of the conspiracy. Carroll further claims that because he withdrew from the conspiracy by acting as the State's agent, the statements were not made by coconspirators and were inadmissible.

A statement made by a member of a conspiracy, made during the course of and in furtherance of the conspiracy and offered against another member of the conspiracy, is not hearsay. NRS 51.035(3)(e).

Furtherance of the conspiracy is not limited to the commission of the crime; it also applies to attempts to avoid detection. *Holmes v. State*, 129 Nev., Adv. Op. 59, 306 P.3d 415, 422 (2013). At the time the statement is made, the defendant need not be a member of the conspiracy. *See McDowell v. State*, 103 Nev. 527, 529-30, 746 P.2d 149, 150 (1987) (stating that NRS 51.035(3)(e) requires "that the co-conspirator who uttered the statement be a member of the conspiracy at the time the statement was made." The statute "does not require the co-conspirator against whom the statement is offered to have been a member at the time the statement was made."); *see also United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989) (holding "that for withdrawal to limit a conspirator's liability and . . . his exposure to statements by co-conspirators, mere cessation of activity is not enough [ ];" the defendant must take affirmative steps by "either the making of a clean breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators" (internal quotations and citations omitted)).

While avoiding detection and arrest are in furtherance of a conspiracy, the conspiracy does not continue endlessly. *State v. Davis*, 528 P.2d 117, 119 (Or. Ct. App. 1974). This court has not identified a bright-line test to determine when an act of concealment may be considered in furtherance of a conspiracy. In *Davis*, however, the Oregon Court of Appeals distinguished between:

> (1) those affirmative acts of concealment directly related to the substantive crime of a nature within the contemplation of the conspirators, and

> (2) those general acts of concealment, by silence or by reaction to police activity, which occur after the primary objectives of the conspiracy have been achieved and the acts directly in furtherance of those objectives have been performed.

SUPREME COURT
OF
NEVADA

(O) 1947A

8

*Id.* In considering this distinction, the Oregon court determined that disposing of evidence was still in furtherance of the conspiracy, but concealing evidence upon arrest was less definitive. *Id.*

Here, Carroll's argument that he was no longer a coconspirator is without merit. This court has ruled that the defendant need not be a member of the conspiracy at the time the statement was made, so long as the declarant was part of the conspiracy when the statement was made and the defendant was a part of the same conspiracy at some point. *See McDowell*, 103 Nev. at 529-30, 746 P.2d at 150. Although Carroll was assisting the police at the time of the wire recording, the Palomino Club managers believed they were still trying to avoid detection. Therefore, the district court did not err when it determined the managers were Carroll's coconspirators pursuant to NRS 51.035(3)(e). Moreover, Carroll did not make his withdrawal known to his coconspirators. Lastly, we cannot conclude that he truly made a "clean breast" to authorities because he told multiple stories to the detectives in order to minimize his culpability. *See Patel*, 879 F.2d at 294.

Carroll's argument that the statements were not made in furtherance of the conspiracy is likewise unsuccessful. Carroll cited *Davis*, but the Oregon Court of Appeals did not decide whether post-arrest statements were in furtherance of the conspiracy; thus, *Davis* does not help Carroll here. *Davis*, 528 P.2d at 119. Here, the managers made their statements prior to arrest. We conclude that these statements were admissible because even if Carroll had withdrawn from the conspiracy, the other members had not. Thus, the managers' statements were in furtherance of the conspiracy.

*Whether the club managers' statements violated Carroll's right against self-incrimination*

Carroll argues the admission of the managers' statements violated his right against self-incrimination because he had to choose between forfeiting his right to explain the statements or his right to not testify. Carroll concludes this violated his substantial rights because the State referenced his fabricated statements as proof that he intended to kill Hadland rather than to orchestrate a battery. We conclude Carroll's constitutional rights were not violated because these statements did not force him to testify and both parties provided the proper context to the statements.

When the district court admitted the wire recordings, Carroll did not object based on his right against self-incrimination. Although Carroll did not preserve the self-incrimination issue for appeal, because it is a constitutional issue, we may address it. *See McCullough v. State*, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983).

Both the United States and Nevada Constitutions protect a defendant in a criminal action from being compelled to testify against himself. U.S. Const. amend. V, § 3; Nev. Const. art. 1, § 8.

Carroll complains that the admission of the wire recordings put him between the proverbial rock and a hard place in deciding whether to testify. However, the same may be said about essentially every incriminating piece of evidence the State offers in any criminal prosecution. Facing such a difficult decision to testify does not violate a defendant's constitutional rights. *See Dzul v. State*, 118 Nev. 681, 693, 56 P.3d 875, 883 (2002) ("[T]he Fifth Amendment does not insulate a defendant from all difficult choices that are presented during the course of criminal proceedings . . . ." (internal quotations omitted)). Because Carroll

did not testify and was still able to put the recordings in the proper context, he fails to demonstrate that his constitutional right against self-incrimination was violated. Therefore, we conclude that the district court did not abuse its discretion when it admitted Carroll's or his coconspirators' statements from the wire recordings. *See McCullough*, 99 Nev. at 74, 657 P.2d at 1158; *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009) ("We generally review a district court's evidentiary rulings for an abuse of discretion.").

*Police interrogation*

*Whether police coerced Carroll's statement*

Carroll asserts the police coerced his statement by promising him leniency if he implicated himself in Hadland's murder. The question for our consideration is whether the police promised Carroll leniency when they promised to take him home and, if so, whether this promise coerced his statement.

"'[T]he totality of the circumstances'" is the primary consideration for determining voluntariness. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) (quoting *Fikes v. Alabama*, 352 U.S. 191, 197 (1957)). This court has held that "[t]he question in each case is whether the defendant's will was overborne when he confessed." *Passama v. State*, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987). The trial court should consider factors such as: "the youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Id.*

Trial courts should also consider police deception in evaluating the voluntariness of a confession. *Sheriff, Washoe Cty. v. Bessey*, 112 Nev. 322, 325, 914 P.2d 618, 619 (1996). Deception by police does not

11

automatically render a confession involuntary. *Id.* at 325, 914 P.2d at 620. Police subterfuge is permissible if "the methods used are not of a type reasonably likely to procure an untrue statement." *Id.*

In looking at the totality of the circumstances based on the *Passama* factors, we conclude that the police did not coerce Carroll's statement. Police did not take advantage of Carroll through his youth, a lengthy detention, repeated and prolonged questioning, or physical punishment. Thus, these factors weigh in the State's favor. As previously discussed, the police did not advise Carroll of his *Miranda* rights, which weighs in Carroll's favor. Evidence at trial revealed Carroll has below-average intelligence, but a detective testified that during the interrogation, he did not observe any indicators that Carroll was cognitively disabled. Therefore, this factor does not weigh for or against the State. Accordingly, the *Passama* factors do not show police overcame Carroll's will when they interrogated him.

The use of falsehoods during the interrogation also does not show police overcame Carroll's will. Carroll complains the police promised him leniency and that he would not go to jail. However, the record does not indicate any such promises. The police promised Carroll they would take him home at the conclusion of the interview, which they did. The police also promised Carroll they would attempt to prove his version of events was true, which they did by making the recordings with Carroll's coconspirators. While Carroll may have misunderstood the detectives' statements as a promise of leniency, the promise of taking Carroll home at the end of the interrogation and trying to prove his story were not impermissible falsehoods that would render Carroll's statements involuntary and entitle him to a new trial. *See id.* Accordingly, we

conclude that the detectives' promises to take Carroll home did not constitute a promise of leniency and did not coerce his statement.

*Whether Carroll was in custody for Miranda purposes*

Carroll also claims that police violated his *Miranda* rights. The question presented is whether Carroll was in custody for purposes of *Miranda* and, if so, whether he properly received *Miranda* warnings.

"[A] trial court's custody and voluntariness determinations present mixed questions of law and fact subject to this court's de novo review." *Rosky v. State*, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005). This court explained the manner in which it reviews these decisions:

> The proper inquiry requires a two-step analysis. The district court's purely historical factual findings pertaining to the "scene- and action-setting" circumstances surrounding an interrogation [are] entitled to deference and will be reviewed for clear error. However, the district court's ultimate determination of whether a person was in custody and whether a statement was voluntary will be reviewed de novo. . . .
>
> For this standard of review to function properly, "trial courts must exercise their responsibility to make factual findings when ruling on motions to suppress."

*Id.* at 190-91, 111 P.3d at 694-95 (quoting *In re G.O.*, 727 N.E.2d 1003, 1010 (Ill. 2000)). "[W]here the trial court's determination that a defendant was not improperly induced to make the statement [to police] is supported by substantial evidence, . . . such a finding will not be disturbed on appeal." *Barren v. State*, 99 Nev. 661, 664, 669 P.2d 725, 727 (1983).

Initially, we take issue with the district court's failure to issue an order containing findings of fact and conclusions of law. *See Rosky*, 121 Nev. at 191, 111 P.3d at 695 (explaining that "trial courts must exercise

their responsibility to make factual findings when ruling on motions to suppress" (internal quotations omitted)). In the instant case, the district court denied Carroll's pretrial motion without making factual findings or conclusions of law. We again remind the district courts of their duty to enter a proper order with factual findings and legal conclusions when ruling on motions to suppress in order to facilitate appellate review. The trial court did not make any "factual findings pertaining to the 'scene- and action-setting' circumstances surrounding [the] interrogation," *see id.* at 190, 111 P.3d at 694, so we cannot give deference to any such findings.

*Miranda* warnings are "required when a suspect is subjected to a custodial interrogation." *Archanian v. State*, 122 Nev. 1019, 1038, 145 P.3d 1008, 1021 (2006). A defendant's statements made during a custodial interrogation may be admitted at trial only if *Miranda* rights were administered and validly waived. *Koger v. State*, 117 Nev. 138, 141, 17 P.3d 428, 430 (2001). A defendant is "in custody" under *Miranda* if he or she has been formally arrested or his or her freedom has been restrained to "the degree associated with a formal arrest so that a reasonable person would not feel free to leave." *State v. Taylor*, 114 Nev. 1071, 1082, 968 P.2d 315, 323 (1998). Custody is determined by the totality of the circumstances, "including the site of the interrogation, whether the objective indicia of an arrest are present, and the length and form of questioning." *Id.* at 1081-82, 968 P.2d at 323. An individual is not in custody for *Miranda* purposes if the police are merely asking questions at the scene of the crime or where an individual questioned is merely the focus of a criminal investigation. *Id.* at 1082, 968 P.2d at 323 (internal citations omitted).

*Site of the interrogation*

First, the site of the interrogation indicates Carroll was in police custody when he gave his statement. A detective testified that although Carroll drove himself to the Palomino Club, the police drove Carroll in an official police vehicle to the homicide office to conduct the interrogation. The detective admitted they could have questioned Carroll at the Palomino Club where they found him, or at Carroll's residence, which was a short walk from the club, and still have been able to make an audio recording of the questioning. However, the detective stated the homicide office is a "more intimidating place to question a witness." The detective also testified that the interrogation room was small and had only one door. He explained that Carroll sat behind a desk with his back toward the wall furthest from the door. The detective also explained that he and another detective sat on the other side of the desk, closest to the door.

This environment suggests that Carroll was in custody. Police drove him to the homicide office for questioning, so Carroll could not terminate the interrogation or leave the homicide office unless the detectives agreed and gave him a ride home. Moreover, the detectives deliberately intimidated Carroll by taking him to the homicide office instead of questioning him at a more convenient location.

Additionally, the arrangement of the room suggests Carroll was in custody. By seating Carroll in a very small room, the furthest from the door, and putting a desk and two police detectives between him and the exit, Carroll was physically precluded from leaving the room unless the detectives stood, moved, and allowed him to leave. Accordingly, the site of the interrogation suggests Carroll was in custody at the time of the interrogation.

SUPREME COURT
OF
NEVADA

(O) 1947A

This case is distinguishable from *Silva v. State*, 113 Nev. 1365, 951 P.2d 591 (1997). In *Silva*, we relied upon *California v. Beheler*, 463 U.S. 1121, 1125 (1983), and concluded that questioning the suspect at a police station "does not automatically mean that he was in custody." *Silva*, 113 Nev. at 1370, 951 P.2d at 594. "Silva was questioned for approximately one to two hours and was allowed to speak with his sister when he requested." *Id.* at 1369, 951 P.2d at 594. We also noted that the record did not show that police withheld food or drink from Silva and that the police did not promise him anything. *Id.* Based on the totality of the circumstances, we concluded that the site of the interrogation did not create a custodial interrogation. *Id.* at 1370, 951 P.2d at 594.

Here, however, the circumstances are different. Police did not allow Carroll to use his telephone when he said he needed to make a call so he could confirm that he did not kill Hadland, and police actually took Carroll's telephone away from him. Police also told Carroll to "sit tight" and did not take him home when he said that he wanted to go home. The detectives also promised Carroll that they would confirm his claim that he did not murder Hadland and was acting under the direction of the Palomino Club management. Thus, we cannot reach the same conclusion we reached in *Silva*.

*Objective indicia of arrest*

Objective indicia of arrest comprise the following:

(1) whether the suspect was told that the questioning was voluntary or that he was free to leave; (2) whether the suspect was not formally under arrest; (3) whether the suspect could move about freely during questioning; (4) whether the suspect voluntarily responded to questions; (5) whether the atmosphere of questioning was police-dominated; (6) whether the police used

strong-arm tactics or deception during questioning; and (7) whether the police arrested the suspect at the termination of questioning.

*Taylor*, 114 Nev. 1071, 1082 n.1, 968 P.2d 315, 323 n.1.

First, although the detectives testified that Carroll was not under arrest when they interrogated him and that Carroll was not handcuffed or in any way restrained, the objective indicia of arrest likewise indicate Carroll was in police custody when he gave his statement. The interrogating detectives did not tell Carroll he was free to leave. At the beginning of the interrogation, a detective informed Carroll he was not under arrest "right now" and noted that Carroll was speaking with him and another detective voluntarily. However, the record does not reflect that police informed Carroll he could refuse to speak with them or terminate the interrogation at any time if he wished. Police did not provide Carroll with *Miranda* warnings until the interrogation was two-thirds finished and he implicated himself in Hadland's murder. Additionally, Carroll repeatedly informed the detectives that he wanted to go home before making implicating statements, but the detectives ignored his requests. Thus, this factor weighs in Carroll's favor.

Second, as previously indicated, police informed Carroll he was not under formal arrest when he was questioned. Thus, this factor weighs in the State's favor.

Third, as also indicated previously, the record shows the interrogation room was very small and likely prevented Carroll from moving freely when he was questioned. The room was arranged with one small table and three chairs. Also, there was only one door, and the detectives seated Carroll furthest from the door. He also could not leave the room without asking the detectives to move and allow him to leave.

Additionally, detectives did not let Carroll outside the interrogation room; they instructed him to "sit tight." Thus, Carroll could not move about freely during questioning and this factor weighs in Carroll's favor.

Fourth, the transcript of Carroll's statement to police shows Carroll voluntarily responded to the detectives' questions, although he did not respond honestly until the detectives promised to protect him and take him home after the interrogation. Nevertheless, Carroll repeatedly voiced his apprehension in speaking candidly to the detectives. When a detective accused Carroll of not being honest with them, Carroll told the detective he did not want to get into trouble because he had a child at home. When another detective told Carroll they knew he was not telling them the whole story, Carroll told them he feared for his life and feared he could go to jail. Carroll also repeatedly asked if he would be allowed to go home and repeatedly said he wanted to go home, but detectives did not terminate the interview and take Carroll home. Thus, this factor weighs in Carroll's favor.

Fifth, the detectives dominated the atmosphere when they interrogated Carroll. Two detectives questioned Carroll throughout the interrogation; not one of the three questioning detectives ever spoke with Carroll alone. Additionally, when Carroll asked the detectives if he could make a telephone call to confirm his story, the detectives refused and took Carroll's phone from him. Similarly, the detectives transported Carroll to the homicide office, and they did not take him home when he expressed a desire to go home. Thus, this factor clearly and overwhelmingly weighs in Carroll's favor.

Sixth, a detective deceived Carroll when he claimed police obtained Carroll's cellular phone records indicating Carroll was near the

scene of the crime when it occurred. The detectives did not tell Carroll any other blatant lies to secure his statement. Strong-arm tactics, however, are evident throughout the interrogation. The detectives transported Carroll from his place of employment to the homicide office, instead of a more convenient or more comfortable location, questioned him in a small room, and took his phone from him. These tactics indicated custody.

The detectives also used the tactic of promising Carroll that they would take him home after the interrogation and prove his story about how Hadland was killed if he told them the truth. This tactic was successful. Prior to making this promise, Carroll did not incriminate himself in Hadland's murder. After the detective made this promise to Carroll, Carroll implicated himself in the murder. And detectives testified that the last detective to question Carroll intentionally used threatening interrogation techniques. Thus, this factor weighs in Carroll's favor.

Last, a detective testified that at the end of the interrogation, the detectives took Carroll home—he was not arrested at that time. Thus, this factor weighs in favor of the State.

In sum, only two of seven factors weigh in the State's favor, one factor does not weigh for or against the State, and four of the factors weigh in Carroll's favor. Accordingly, objective indicia of arrest suggest Carroll was in custody at the time of the interrogation.

*Length and form of questioning*

At 9:25 p.m., detectives questioned Carroll for approximately two and one-half hours, excluding breaks. The detectives met Carroll at the Palomino Club and took him from his place of employment and questioned him until almost midnight. Furthermore, a detective testified that one purpose of the breaks was to let Carroll "kind of go a little bit

crazy." Moreover, a third detective joined the original two because the third detective was more aggressive than the first two detectives. Such a scenario belies the detective's trial testimony that they questioned Carroll as a witness, not a suspect. Had detectives truly questioned Carroll as a witness, they likely would have done so at a more convenient, less intimidating location, such as at the Palomino Club where they contacted him, or at his home, which was near the club, rather than the police station across town. And if the police had simply questioned Carroll as a witness and not as a suspect, the detectives would likely not have taken breaks to let Carroll's mind "go crazy" or found a need to use a third, more aggressive detective. Therefore, the length and form of questioning suggest Carroll was in custody at the time of the interrogation.

The detectives chose not to provide *Miranda* warnings until the last of the three detectives began questioning Carroll, which was after he had already made inculpatory statements. Although Carroll was not formally under arrest, he was in custody and should have received *Miranda* warnings. *See Archanian*, 122 Nev. at 1038, 145 P.3d at 1021-22. We therefore conclude that the district court erred by not suppressing Carroll's statements.

*Post-Miranda statements*

We additionally conclude that Carroll's statement to police after he received the *Miranda* warnings should have been suppressed pursuant to the Supreme Court's holding in *Missouri v. Seibert*, 542 U.S. 600, 611-12 (2004). In *Seibert*, like here, police delayed recitation of the *Miranda* warnings until the defendant confessed to the crime. *Id.* at 604-05. After the defendant confessed, police provided the requisite warnings and obtained a signed waiver of rights. *Id.* at 605. Police then re-questioned the defendant using the admissions she made before receiving

SUPREME COURT
OF
NEVADA

(O) 1947A

20

the warnings. *Id.* The Court determined the midstream warnings "could [not] have served their purpose" and ruled the post-warning statements were inadmissible. *Id.* at 617. The Court explained the consideration a reviewing court must undertake in determining if post-warning statements are admissible:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611-12.

The instant case is indistinguishable from *Seibert*. We conclude that the midstream warnings did not properly advise Carroll that he could terminate the interrogation despite his previous inculpatory statements. Carroll's post-warning statements were simply a repetition of his pre-warning statements. The detectives told him that they would take him home and that he would not go to jail if he told them the whole truth. Although police recited the *Miranda* warnings, Carroll was just as dependent upon police to take him home and just as fearful he would go to jail after he received the warnings as he was before. Despite the short break in questioning, Carroll was subjected to a single, continuous course of questioning during which the detectives chose to withhold the *Miranda*

SUPREME COURT
OF
NEVADA

(O) 1947A

21

warnings. Therefore, the district court should have suppressed Carroll's post-*Miranda* statement to police.

However, we conclude that although the district court erred in admitting Carroll's statement into evidence at trial, the State has shown that the error was harmless. *See Boehm v. State*, 113 Nev. 910, 916, 944 P.2d 269, 273 (1997) (applying harmless error analysis to a statement admitted at trial in violation of *Miranda*). Aside from Carroll's inculpatory statements to the police, the district court properly admitted other powerful evidence of his guilt. Thus, our review of the record convinces us that this error is harmless beyond a reasonable doubt.

*Sufficiency of the evidence*

We have reviewed Carroll's argument that the State did not present sufficient evidence to convict him of conspiracy or murder because the State failed to show he intended for Counts to kill Hadland. We conclude that this argument is without merit. The evidence at trial supported a finding that Carroll knew the order was to kill Hadland and that Carroll recruited Counts so he did not have to kill Hadland himself. This is sufficient to convict on both charges. *See Doyle v. State*, 112 Nev. 879, 894, 921 P.2d 901, 911 (1996) ("A person who knowingly does any act to further the object of a conspiracy, or otherwise participates therein, is criminally liable as a conspirator."), *overruled on other grounds by Kaczmarek v. State*, 120 Nev. 314, 91 P.3d 16 (2004).

*Cumulative error*

Lastly, Carroll argues that cumulative error denied him of a fair trial, even if the specific errors, standing alone, are insufficient for a new trial. We disagree. The sole error was the district court's denial of Carroll's motion to suppress his statement to police because police violated *Miranda*. We determined this error was harmless beyond a reasonable

doubt, and one error cannot cumulate. *See United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("One error is not cumulative error.").

As we previously explained, the district court erred when it admitted Carroll's statement to police because Carroll was in custody for *Miranda* purposes and the police failed to provide *Miranda* warnings before Carroll made inculpatory statements. However, based on the overwhelming evidence establishing Carroll's involvement in Hadland's murder, we conclude the district court's error in admitting Carroll's statement was harmless beyond a reasonable doubt. Even without his statements to police, the remaining evidence was sufficient to sustain his convictions.

Accordingly, we affirm the judgment of the district court.

_____ , J.
Cherry

We concur:

_____ , C.J.
Parraguirre

_____ , J.
Douglas